IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RYAN LEONARD, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | CLASS ACTION<br>JURY TRIAL DEMANDED |
| v. | ) ) | |
| DRAFTKINGS, INC., a Delaware Corporation, And FANDUEL, INC., a Delaware Corporation, | ) ) ) ) | Case No.: |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Ryan Leonard ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, brings this action against DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel"), (collectively "Defendants"), and states as follows:

## NATURE OF THE CASE

1.     This is a class action complaint against FanDuel and DraftKings, two companies operating daily fantasy sports ("DFS") websites in a manner that violates federal law.

2.     DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis.  That is, Defendants operate tournaments where individuals accumulate points based on the real-life statistics of players in professional sporting events that occur on a particular day.  Individuals can play for free or pay money to compete for cash prizes.

3.      The start of the 2015 NFL season saw a huge media blitz as Defendants spent more than $100,000,000 on television ads and became two of the top television advertisers in the United States.  As a result of this advertising blitz, Defendants added millions of new users.[1]

4.      Defendants make money on the fee they take from each entry onto their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

5.      The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

6.      DraftKings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their size.[2] According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[3]

7.      The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[4]

8.      To make things more complicated, FanDuel and DraftKings openly allowed employees to participate in the opposing entities' contest until October 2015.

---

[1] http://blogs.wsj.com/cmo/2015/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/ (acccessed October 7, 2015)
[2] *Id.; see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623; (https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5; (accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)
[3] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015)
[4] https://rotorgrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 8, 2015)

9.      There have been reports of DraftKings employees having access to inside information, which could provide valuable insight into fantasy player selection.

10.     These material misrepresentations and omissions fraudulently induced Plaintiff and the proposed Class to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

11.     Specifically, Plaintiff and other similarly situated Class members deposited and risked their money on a DraftKings and FanDuel contests without knowledge that DraftKings and FanDuel employees were using valuable inside information that was not disclosed or provided to the public.

## PARTIES, JURISDICTION AND VENUE

12.     Plaintiff, Ryan Leonard, is a resident of Watertown, in Middlesex County Massachusetts, and citizen of Massachusetts.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described below.

13.     Defendant DraftKings, Inc. is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

14.     Defendant FanDuel, Inc. is a Delaware corporation with its principal place of business in New York, New York.

15.     This Court has subject matter jurisdiction over both the parties and the subject matter because a substantial number of the events giving rise to this Complaint occurred in Massachusetts, including all activities of DraftKings and some or all of the concerted activities.

16.     Additionally, Under 28 U.S.C. 1391(c) for purposes of venue a defendant is a resident of any district which could exercise personal jurisdiction over that defendant. The

District of Massachusetts is the proper venue for this action because DraftKing's headquarters are in Boston, Massachusetts and some of the events giving rise to this action occurred here.

## FACTUAL BACKGROUND

### A.    Daily Fantasy Sports

17.    Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market.  It is also similar to para-mutual horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

18.    Defendants held themselves out to Plaintiff and the Class as places where their skill made a difference between winning and losing. For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills…you like football, you like winning."   In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJul51), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

19.    Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get paid-for-knowledge) that players could 'get paid for [their] knowledge if they were "smarter than the average fan."

20.    In reality, most of the money on DFS sites goes to a  few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[5] An

---

[5] https://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015)

analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1% of players.[6]

**B.    Value of Inside Information and Data**

21.    DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

22.    DFS is not gambling because of the skill involved in picking a winning team. According to Robins, DraftKings attracts players "who are analytical and favor data and research."  Robins said: "They do their homework.  It's like the stock market.  They enjoy looking at something and trying to figure out something that someone else doesn't see."[7]

23.    The biggest edges any player can have come from having data and information. DraftKings and FanDuel employees have access to both things, neither of which is public.  For instance, DraftKings performs analytics to determine the winning strategies, return on investment of certain strategies and even how lineups on FanDuel would do if they were entered into DraftKings contests.  Defendant knows the value of this data and knows that it should not be shared: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing… That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies.  Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently.  And on that note, I do also

---

[6] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 7, 2015)
[7] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing,* Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gambling/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015)

want to point out that skilled stacking is absolutely a winning strategy on DK There are plenty of people who stack and win very consistently."[8]  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered.  Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

24.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

25.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

26.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

27.     On September 27, 2015, DraftKings' employees Ethan Haskell posted "WEEK 3 MILLIONAIRE MAKER PERCENTAGE OWNED".[10]  This detailed list provided player information and owner percentages for contest participants from 1 pm games.

---

[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015)

[9] http://playbook.draftkings.com/nfl/millionaire-maker-percent-owned-week-3/https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7 (accessed Oct. 7, 2015)
[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#replay-850635 (accessed Oct. 7, 2015)

28.     Haskell accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestant' lineups were "locked" and could therefore still be changed.  Haskell initially claimed he was "the only person with this data and as a [DraftKings] employee, an not allowed to play on [DraftKings] site."[11]  However, the same day, Haskell participated in a contest on the FanDuel site.

29.     This player ownership percentage compared with salary information would provide anyone with an advantage in a DFS contest.

30.     On September 27, 2015, the same day aforementioned information was leaked, Haskell entered the FanDuel "$5M NFL Sunday Million" contest.

31.     Haskell selected four (4) players for his fantasy team that were salaried over $6,000 and owned by less than 8.2% of the 229,885 contest participants.

32.     Based on the salaries of the aforementioned players, Haskell chose players that were anticipated to do well, while not being selected by the majority of contestants.

33.     Conveniently, Ethan Haskell, who posted the above information, came in second place winning $350,000.[12]

34.     This insider knowledge increased Haskell's opportunity to place higher in the contest based on using highly rated players that were not used by the majority of the public.

35.     An analysis of this Haskell's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

36.     DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[13]

---

[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015)
[12] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didn't-expect-uproar/ (accessed Oct. 7, 2015)

37.     DraftKings employees have won at least $6,000,000 playing at FanDuel in, which is more than one million dollars per year considering DraftKings is only a few years old.[14]   The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using nonpublic information, data, and insider strategic information.

38.     DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[15]

39.     FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website[16] Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."

40.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

---

[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)
[14] http://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (accessed Oct. 7, 2015)
[15] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015)
[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)

41.     Robins had previously discussed[17] any sort of issue that affected "game integrity"

as fraud and literally the first person to respond is the employee who won $350,000:

**JRobs**                                                              2 years ago



*DraftKings CEO*

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                                    Reply Quote Link

**Ethan**                                                             2 years ago



*DraftKings Rep*

Awesome detailed response, Jason.

                                                                    Reply Quote Link

42.     In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including

tracking users by their Internet protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

43.    For instance, an analysis by DFS Report shows that an employee at FanDuel who works in product operations is one of the top 50 players in all of DFS, despite only playing on one site.[18]   While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites.  One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites. While the article has been removed from FanDuel's website, a version is still on the Internet. In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy…or10."[19]

44.    According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[20]  FanDuel's CEO admitted to personally playing on competitor sites.[21]

45.    Had Plaintiff and/or members of the proposed Class known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiff and members of the proposed Class would not have played on Defendants' websites.

---

[18] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (accessed Oct. 7, 2015)
[19] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015)
[20] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015)
[21] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fandule-ask-me-anything-381899?page=3 (Oct. 7, 2015)

46. Had Plaintiff and/or members of the proposed Class known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the proposed Class would not have played on Defendants' websites.

47. In October 2014, Plaintiff deposited money and entered a contest on DraftKings site before the disclosure of the fact that DFS employees were playing with inside information.

48. After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

49. DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

50. Ultimately, after the aforementioned details came to light, the Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

## C. Invalidity of Arbitration Provision of Terms of Use

51. The Plaintiff and members of the proposed Class did not agree to an arbitration agreement with Defendant DraftKings and FanDuel, jointly.

52. DraftKings was not a signatory of Plaintiff's and members of the proposed Class's contractual agreement with FanDuel.

53. FanDuel was not a signatory of Plaintiff's and members of the proposed Class's contractual agreement with DraftKings.

54. FanDuel aided-and-abetted DraftKings damaging Plaintiff and members of the proposed Class and violated the contractual agreement with FanDuel.

55.     DraftKings aided-and-abetted FanDuel damaging Plaintiff and members of the proposed Class and violated the contractual agreement with DraftKings.

56.     As a direct and proximate result of the actions described in this Complaint, Plaintiff and members of the proposed Class have been damaged and the arbitration clause is invalid and unenforceable.

## CLASS ALLEGATIONS

57.     A class action is the proper form to bring Plaintiff's claims under Federal Rule of Civil Procedure 23. The potential Class iC so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

58.     The proposed Class is described as follows:

**"All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the parties engage in discovery.

60.     This action satisfies all of the requirements of Federal Rule of Civil Procedure 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

61.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendants.

62.     **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class-wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a)  Whether Defendants made the representations set forth above and substantially similar representations to Plaintiff and members of the proposed Class;

b)  Whether Defendants' advertisements were false, misleading or unfair;

c)  Whether Defendants owed duties to Plaintiff and the proposed Class, the scope of those duties and if they breached those duties;

d)  Whether Defendants fraudulently induced Plaintiff and the proposed Class into using their website under false pretenses, through material misrepresentations or material omissions;

e)  Whether consumers were harmed by Defendants' actions as described above;

f)  The extent of the damages caused by Defendants' acts; and

g)  Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the proposed Class that these practices were occurring.

63. **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

64. The claims of Plaintiff are furthermore typical of other Class members because they make the same claims as other Class members. Plaintiff has an interest in seeking compensation from Defendants.

65. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class members.

66. **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical.

67.     The nature of this action and the nature of Federal law available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

68.     Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

69.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

70.     Excluded from the Class are:

    a) Defendants and any entities in which Defendants have a controlling interest;

    b) Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c)  The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d)  All persons or entities that properly execute and timely file a request for exclusion from the Class;

e)  Any attorneys representing Plaintiff or the Class.

**CIVIL CONSPIRACY**

71.  Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

72.  Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

73.  As detailed above, Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

74.  Specifically, by affirmatively agreeing to allow Draft Kings and FanDuel employees to play on DraftKings and FanDuel sites and profit with insider information, while concealing and not disclosing this to Plaintiff and the proposed Class, Defendants committed RICO violations.

75.  This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit.

76.  FanDuel knew that its employees played on DraftKings.

77.  DraftKings knew that its employees played on Fanduel.

78.  Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

79.     As a direct and proximate result of Defendants' concerted actions, Defendants are liable to Plaintiff and the members of the proposed Class.

## RICO ALLEGATIONS

### Daily Fantasy Sites Enterprise

80.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

81.     Plaintiff, the Class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

82.     Based upon Plaintiff's current knowledge that FanDuel and Draftkings constitute an enterprise, within the meaning of RICO and will be hereinafter referred to collectively as the "Daily Fantasy Sites Enterprise".

83.     The Daily Fantasy Sites Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

84.     While the Defendants participate in and are members and part of the Daily Fantasy Sites Enterprise, and are a part of it, they also have an existence separate and distinct from the enterprise.

85.     The Daily Fantasy Sites Enterprise, knowingly allowed each other's employees to participate in fantasy sports betting games on the FanDuel and DraftKings sites with insider information, the scope and nature of this was concealed from Plaintiff, Class members, and the general public.

87.     In order to successfully retain monies owed by contestants in the manner set forth above, Defendants need a system that allows them to manipulate and control contests and conceal the manner in which that is done. The Daily Fantasy Sites Enterprise provides

Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. The Defendants control and operate the Daily Fantasy Sites Enterprise as follows:

a)      By developing public interest through advertising assuring the public has a fair chance to acquire large cash prizes through skill;

b)      By developing software, spreadsheets, data collections; and monitoring trends which is available to their employees, but not the general public; and

c)      By allowing their employees to openly participate in the other entity's contests;

88.      As set forth above, the Daily Fantasy Sites Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

## Predicate Acts

89.      Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme.

90.      In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. §2. As a result, their conduct is indictable under 18 U.S.C. §1343 on this additional basis.

## Violations of 18 U.S.C. § 1343

91.      For the purpose of executing and/or attempting to execute the above described

scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things which include but are not limited to agreements, spreadsheets, correspondence, player data, payments, reports, data, summaries, oral and written statements.

92.     The matter and things sent by Defendants via wire or other interstate electronic media include, *inter alia*:

        a)     material containing false and fraudulent misrepresentations that Plaintiff and Class members had a fair and equal opportunity to compete in Defendants' contests;

        b)     material which concealed or failed to disclose that Defendants' inside information, which provides techniques and data as described above, to deprive Plaintiff and Class members an equal opportunity to compete in Defendants' contests;

93.     Other matter and things sent through or received from interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

94.     The Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and the Class and obtaining their property for the Defendants' gain.

95.     The Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiff and the Class relied on the misrepresentations and omissions as set forth above.

96.     As a result, Defendants have obtained money and property belonging to Plaintiff

and Class members, and Plaintiff and the Class have been injured in their business or property by the Defendants' overt acts of wire fraud, and by their aiding and abetting each other's acts of wire fraud.

## Pattern of Racketeering Activity

97.     Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. § 1343 as described above, within the past t w o ( 2 ) years. In fact, each of the Defendants has committed or aided and abetted in the commission of countless acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and Class members.

98.     The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CAUSES OF ACTION

## COUNT I

## (VIOLATIONS OF RICO 18 U.S.C. § 1962(c))

99.     Plaintiff incorporates and realleges the preceding paragraphs as if fully set out herein.

100.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity …."

102.    18 U.S.C. § 1961(4) of RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

103.    As stated above, for purposes of this claim, the defendant enterprises are as follows: (i) the Daily Fantasy Sites Enterprise consisting of DraftKings Inc., and FanDuel Inc.

104.    With respect to the allegations contained herein, the Daily Fantasy Site Enterprise has engaged in a "pattern of racketeering activity", as defined in § 1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above.  Each such act of racketeering activity was related, has similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiff and the Class.

105.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the Daily Fantasy Sites Enterprise respectively, as described above, were related

to each other and amount to and pose a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity", as defined in 18 U.S.C. § 1961(5).

106.    With respect to the activities alleged herein, the Daily Fantasy Sites Enterprise has acted at all times with malice toward the Class, in their participation and control over the enterprise of the Class.  The Daily Fantasy Sites Enterprise has exercised influence and power over the enterprise with the intent to engage in the conduct complained of for the benefit of itself and with knowledge that such conduct constituted unlawfulness.  Such conduct was done with reckless disregard for the rights of the Class as well as the laws to which the defendants are subject, the same amounting to actionable wantonness.

107.  The Daily Fantasy Sites Enterprise's respective acts amount to an overt and extortionate scheme to exercise control over the outcomes of the daily fantasy site contests without Plaintiff's and the Class's knowledge and have further deprived Plaintiff and the Class of property, including contest fees, and deposits; which continues to constitute a pattern of illegal activity that has and continues to inflict harm upon Plaintiff and the Class. Plaintiff and the Class, as victims of the unlawful pattern of illegal activity have and continue to suffer economic and intangible property loss.

108.    In carrying out the overt acts and fraudulent extortionate scheme described above, the Daily Fantasy Site Enterprise has respectively engaged in conduct in violation of federal laws, including inter alia 18 U.S.C. § 1343, 18 U.S.C. 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1952(a), and 18 U.S.C. § 1961, et seq. (RICO) as set forth more fully above.

109.    Therefore, defendants have each engaged in "racketeering activity which is defined in Section 1961(1) of RICO to mean "any act which is indictable under any of the

23

following provisions of Title 18, United States Code section 1343 (relating to wire fraud), [and] section 1952 (relating to racketeering [Travel Act]).”

110.    As a proximate result of Defendants' unlawful pattern of illegal extortionate conduct as described above, Plaintiff and the Class have been injured in their business or property as described above in an amount to be determined at trial.

**COUNT II**

**(VIOLATIONS OF 18 U.S.C. § 1962(d) BY CONSPIRING
TO VIOLATE 18 U.S.C. § 1962(a) and (c))**

111.    Plaintiff incorporates and realleges the preceding paragraphs as if fully set out herein.

112.    This claim for relief arises under 18 U.S.C. § 1964(a) of RICO and seeks to recover actual and treble damages against Defendants for violations of 18 U.S.C. § 1962(d) for their conspiring to violate 18 U.S.C. § 1962(a) and (c).

113.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section."

114.    Section 1961(4) of RICO defines "enterprise" to include "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

115.    For purposes of the claim of a conspiracy in violation of Section 1962(d) to violate Section 1962(a), the enterprise consists of DraftKings, Inc., and FanDuel Inc., (the Daily Fantasy Sites Enterprise).

116.    Section 1962(a) of RICO provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering

activity… to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

117.    At all times relevant herein, the Daily Fantasy Sites Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(a).  The Daily Fantasy Sites Enterprise continues to be the beneficiaries of additional monies realized from the above overt acts and fraudulent schemes or activities to defraud Plaintiff and the Class of money and to deprive Plaintiff and the Class of their intangible property right and economic loss.

118.    Assets generated from Defendants' unlawful practices described herein are at least in the millions of dollars and the proceeds of such income amount to millions of dollars. The Defendants are engaged in and their activities substantially affect interstate commerce.

119.    Each Defendant conspired to derive, and did derive, substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a).  This use of investment injures Plaintiff and Class members because it permits each enterprise to continue, expand, and extend its fraudulent schemes and reach, thereby increasing their respective market share and penetration and therefore, their power.  This use and investment directly and proximately injures Plaintiff and Class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

120.    During the Class period, the DraftKings and their multiple agents have engaged in and continue to engage in this nationwide conspiracy with FanDuel and their multiple agents.

DraftKings and co-conspirators have also conspired and continue to conspire with certain other parties not named as defendants in this Complaint. During the Class period, FanDuel and their multiple agents have engaged in and continue to engage in this nationwide conspiracy with DraftKings and their multiple agents.  FanDuel co-conspirators have also conspired and continue to conspire with certain other parties not named as defendants in this Complaint.

121.    The object of this conspiracy has been and is to violate 18 U.S.C. § 1962(a) by deriving income from a pattern of racketeering activity and to use or invest, directly or indirectly, such income or any part of such income in the operation of the Daily Fantasy Sites Enterprise, which affects interstate commerce, in violation of 18 U.S.C. § 1962(d). Specifically, the object of the conspiracy has been and is to secure income and sustain and/or increase the profits of the Daily Fantasy Sites Enterprise through a pattern of activity that fraudulently induces Plaintiff and the Class to agree to deposit their monies and enter daily fantasy site contests in reliance on material misrepresentations and omissions regarding the Defendants' representations that the contests are fair, while the Defendant co-conspirators do not disclose their pattern of fraudulent activity specifically designed to provide inside information to Defendants and their employees which decreases Plaintiff's and Class members' opportunity to participate in fair daily fantasy contests.

122.    Defendants have also violated Section 1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Section 1962(c) enterprise described previously through a pattern of racketeering activity.

123.    As demonstrated in detail above, the Defendant co-conspirators have engaged in numerous overt and predicate fraudulent and racketeering acts in furtherance of the conspiracy,

including material misrepresentations and omissions designed to fraudulently induce Plaintiff and Class members to agree to participate in daily fantasy contests and failure to disclose numerous internal systemic fraudulent and policies and practices designed to defrau Plaintiff and the Class of money, and to unlawfully influence and interfere with the daily fantasy contest and to deprive Plaintiff and the Class of their intangible property rights, and economic loss.

124.    The Defendant co-conspirators' pattern of fraudulent  racketeering acts include, but are not limited to providing material containing false and fraudulent misrepresentations that Plaintiff and Class members had a fair and equal opportunity to complete in Defendants' contests, concealing material and/or failing to disclose that Defendants inside information which provides techniques and data as described above to deprive Plaintiff and Class members an equal opportunity to compete in the Defendants' contests; and by allowing their employees to participate in the other entity's contest with inside information, all of which was and is designed to exploit Plaintiff and Class members, hindering their ability to participate in a fair daily fantasy contest.

125.    The nature of the above described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(a) and (c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

126.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(a) and (c), Plaintiff and the Class have been and are continuing to be injured as set forth more fully above.  Pursuant to 18 U.S.C. § 1964(c) of RICO, Plaintiff is entitled, therefore, to bring this

action on behalf of the Class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

127.    Defendants have sought to and have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, to-wit:

> a.    Multiple instances of wire fraud violations of 18 U.S.C. § 1343;
>
> b.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;
>
> c.    Multiple instances of travel in interstate commerce to attempt to and to

actually commit wire fraud, in violation of 18 U.S.C. § 1952(a).

128.    Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT III

**(VIOLATIONS OF 18 U.S.C. § 2
BY SEEKING TO AND AIDING AND ABETTING
A SCHEME TO VIOLATE 18 U.S.C. § 1962(a) and (c))**

129.    Plaintiff incorporates and realleges the preceding paragraphs as if fully set out herein.

130.    This claim for relief arises under 18 U.S.C. § 1964(c) of RICO providing for recovery of actual and treble damages for defendants' violations of 18 U.S.C. § 2 by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).

131.    With respect to DraftKings' violation of 18 U.S.C. § 2, DraftKings sought to, and has, aided and abetted FanDuel, and others not named as defendants in this Complaint, in the commission of those violations of 18 U.S.C. § 2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).  With respect to the FanDuel's violation of 18 U.S.C. § 2, FanDuel has sought to, and has, aided and abetted DraftKings, and others not named as defendants in this Complaint, in the commission of those violations of 18 U.S.C. § 2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).

132.    DraftKings has aided and abetted, and has a shared intent to aid and abet FanDuel and the plans in attempting to derive, and in actually deriving substantial income and proceeds through the above described pattern of racketeering activity.  DraftKings also had a shared intent to aid and abet FanDuel in attempting to use or invest, and in using or investing, directly or indirectly, a part of such income or proceeds in the operation of the Daily Fantasy Sites Enterprise described above, in violation of 18 U.S.C. § 2 by attempting to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a).  DraftKings further has aided and abetted, and has a shared intent to aid and abet, FanDuel in conducting or participating in the conduct of the affairs of the Section 1962(c) enterprise described above through a pattern of racketeering activity, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1962(c). FanDuel has aided and abetted, and has a shared intent to aid and abet DraftKings in attempting to derive, and in actually deriving substantial income and proceeds through the above described pattern of racketeering activity. FanDuel also had a shared intent to aid and abet DraftKings in attempting to use or invest, and in using or investing, directly or indirectly, a part of such income or proceeds in the operation of the Daily Fantasy Sites Enterprise described above, in violation of 18 U.S.C. § 2 by attempting to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a).  FanDuel further

has aided and abetted, and has a shared intent to aid and abet, DraftKings in conducting or

participating in the conduct of the affairs of the Section 1962(c) Enterprise described above

through a pattern of racketeering activity, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1962(c).

133.    As a direct and proximate result of Defendants' RICO violation of 18 U.S.C. § 2

by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c), Plaintiff

and the Class have been and are continuing to be injured.  Pursuant to 18 U.S.C. § 1964(c) of

RICO, Plaintiff is entitled, therefore, to bring this action on behalf of the Class and to recover

actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

134.    Defendants have attempted to and have aided and abetted and have committed

and continue to commit the following unlawful racketeering predicate acts.  Through these

unlawful racketeering predicate acts, defendants have attempted to generate, and have continued

to generate, income or proceeds, to-wit:

    a.    Multiple instances of wire fraud violations of 18
          U.S.C. §§ 1343 and 1346;

    b.    Multiple instances of travel in interstate commerce
          to attempt to and to actually commit wire fraud in
          violation of 18 U.S.C. § 1952(a).

135.    Defendants' violations of the above federal laws and the effects thereof detailed

above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal

acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

136.    By reason of each Defendant's violations of 18 U.S.C. § 1962(d) and 18 U.S.C. §

2 by conspiring to violate 18 U.S.C. §§ 1962(a) and (c), and seeking to and aiding and abetting a

scheme to violate 18 U.S.C. §§ 1962(a) and (c), Plaintiff and the Class are entitled to actual and

treble damages pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed Class pray for relief and judgment against Defendants, as follows:

a. For an order certifying the Class, appointing Plaintiff and his counsel to represent the Class and notice to the Class to be paid by Defendants;

b. For damages suffered by Plaintiff and the proposed Class;

c. For restitution to Plaintiff and the proposed Class of all monies wrongfully obtained by Defendants;

d. For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful practices alleged in the Complaint;

e. An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f. For Plaintiff's reasonable attorneys' fees, as permitted by law;

g. For Plaintiff's costs incurred;

h. For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i. For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

Respectfully Submitted:

Dated:  October 26, 2015

*/s/ Patrick J. Sheehan*
Patrick J. Sheehan (BBO #639320)
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-5118
Facsimile: (617) 371-2950
Email: psheehan@whatleykallas.com

Dennis G. Pantazis
D.G. Pantazis, Jr.
Patrick L. Pantazis
WIGGINS CHILDS PANTAZIS FISHER GOLDFARB LLC
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Telephone: 205-314-0531
Facsimile: 205-314-0731
Email: dgp@wigginschilds.com
      dgpj@wigginschilds.com
      ppantazis@wigginschilds.com

*Attorneys for Plaintiff*